**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**Index No. 08-3850 (JLL) (CCC)**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

---------------------------------------------------------x

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Docket No. 08-3850 (JLL)

MASEFIELD INTERNATIONAL INC.,

Plaintiff(s),

-vs-

TERMINAL VENTURES, INC.,

Defendants Third-Party Plaintiff,

-vs-

MASEFIELD AG ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY and JOHN DOE,

Third-Party Defendants.

Deposition of:

JOSEPH DiMAURO
(VOLUME I)

A. BACCARO ASSOCIATES, LLC
Certified Court Reporters
230 Sherman Avenue
Berkeley Heights, New Jersey 07922
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: office@abaccaroassociates.com

- - -

TESTIMONY UPON ORAL EXAMINATION OF

JOSEPH DIMAURO

Wednesday, June 24, 2009

- - -

REPORTED BY: MARY JO MONTELEONE, CCR

- - -

A. BACCARO ASSOCIATES, LLC
Court Reporting Services
230 Sherman Avenue
Berkeley Heights, New Jersey 07922
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: office@abaccaroassociates.com

- - -

T R A N S C R I P T of testimony taken stenographically pursuant to Superior Court Rules of Practice and Procedure by and before **MARY JO MONTELEONE**, a Certified Court Reporter and Notary Public of the State of New Jersey, at the offices of GIBBONS, P.C., One Gateway Center, Newark, New Jersey, commencing at approximately 10:00 a.m.

- - -

A P P E A R A N C E S:

HILL, RIVKINS & HAYDEN, ESQUIRES
45 Broadway
New York, New York
By: ROBERT G. CLYNE, ESQUIRE
LAUREN E. KOMSA, ESQUIRE
Appearing on behalf of the Plaintiff, Masefield International Inc. and Third-Party Defendant, Masefield AG

DOYLE & DOYLE, ESQUIRES
636 Morris Turnpike,
Short Hills, New Jersey 07078
By: GERARD S. DOYLE, JR., ESQUIRE
DAVID D. GABEL, ESQUIRE
Appearing on behalf of the Defendant, Third Party Plaintiff, Terminal Ventures, Inc.

GIBBONS, P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, Pennsylvania 19103-2769
By: THOMAS S. BROWN, ESQUIRE
Appearing on behalf of the Third-Party Defendant, Liberty Mutual Insurance Company

A. **She is the bookkeeper, treasurer.**
Q. Okay. The other company that you mentioned is Clark Dodge. Is that correct?
A. **Yes.**
Q. What is the business of that company?
A. **It's a broker dealer registered with FINRA. It's a retail stock brokerage firm.**
Q. What position do you hold in that company?
A. **COE.**
Q. How many employees are there of that company?
A. **Approximately 45.**
Q. Where is that company located, its principal address?
A. **The principal address is the same, 2 Gannett Drive.**
Q. Is Clark Dodge incorporated in New York?
A. **It's a Florida corporation.**
Q. With its principal place of business at 2 Gannett Drive?
A. **That's correct.**
Q. How about Eastern Energy? Is that a New York corporation?

A. **Yes.**
Q. How long has Eastern Energy been in business?
A. **About two years. I'm sorry -- it's a few years. I'm not exactly sure of the year.**
Q. We'll come back to that. Could you just briefly outline for us your education and your work experience?
A. **I have a bachelor of arts in economics from St. Francis College. I received that in 1970. I have an MBA in finance from Long Island University. And I received that in 1973.**
Q. In terms of your work experience, could you just outline that for us?
A. **I started work at Con-Edison of New York in 1970 as a fuel purchaser. From 1973 to 1978, I was employed as an oil broker for PVM Oil Associates. From 1978 to 1986, I opened my own firm. It was called Triad Petroleum. That was a broker.**
Q. I'm sorry, that was '78 to '86?
A. **Yes, '86.**
Q. What was the name of that company?
A. **That was Triad Petroleum.**
Q. Triad Petroleum?
A. **Triad, T R I A D.**

Q. Let me stop you and ask a couple questions. When you worked for PVM Oil Associates, where were you employed? Where was the office?
A. **It was 277 Park Avenue.**
Q. That entire time you worked as an oil broker. Is that correct?
A. **That's right.**
Q. And then in '78 you started Triad Petroleum. Correct?
A. **Yes.**
Q. Was that an oil brokerage firm as well?
A. **Yes, sir.**
Q. And at the time that you started that company how many employees did you employ?
A. **As I can recall, I think it was about six at that time. By 1986 it was up to about 25.**
Q. What became of that company?
A. **It's an inactive company. I changed -- I changed -- I went from being an oil broker to oil trader and I just ended that business.**
Q. In terms of ending it, what happened to the employees? Did you just discontinue the company or --
A. **Some of the employees went to work for International oil brokers. Other people went to --**

**they just went to different industry places.**
Q. You basically shut down the company. Is that right?
A. **That's correct.**
Q. You said you went into the oil trading business. Is that right?
A. **That's right.**
Q. And did you form a company?
A. **It was called Eastern of New Jersey. It was a New York corporation.**
Q. Where was Triad's principal place of business?
A. **I think the address was 801 or 301, I'm not sure. But it was on 42nd Street and Third Avenue in Manhattan.**
Q. So it was in New York City?
A. **Yes.**
Q. And when you formed Eastern of New Jersey. Where was that business located, back in '86?
A. **711 Westchester Avenue, White Plains, New York.**
Q. Now, between 1978, when you started Triad, and 1986, when you formed Eastern of New Jersey, did you own any other companies?

Q. Do you know who that company was sold to?

**A. A guy by the name of Vito DeMaio, D E M A I O.**

Q. Who was Mr. DeMaio?

**A. He was a friend of mine since childhood. We were together in grammar school, high school and college together. I know him my whole life practically.**

Q. What was his background?

**A. He was in finance. He was a CPA. Worked for various large corporations. And wanted a career change. So he had come to see me in the mid '90s. And I told him about this oil terminal. I said, I don't have the time to run this, but if he wanted to. I helped him.**

Q. Did you discuss with him the problems or -- strike that.

Did you discuss with him the issue of Mr. Silverberg's business deteriorating and how you were going to deal with that?

**A. Well, I told him the terminal was built as a residual fuel, heating oil terminal. I thought the terminal could be a very good location for distributing heating oil and kerosene. And since I**

**had this business going on from the refinery in New Orleans, I could actually supply him with kerosene and heating oil. So he thought it was a good idea.**

**And there was another factor, too. I had an ongoing tax thing with the IRS that they didn't want to close my tax returns. And I couldn't get a 637 license, I think it's called, but Vito could. So it was something that I said, Here, if you can get this together, you know.**

Q. What's a 637 license?

**A. It allows you to sell domestic heating oil and kerosene and diesel tax free. But if you have tax issues you're not allowed to get it.**

Q. And at this point in time you were having tax issues with the IRS?

**A. Well, they kept my taxes open because of some tax shelters from 1979, which I finally was able to solve around 2000.**

Q. Okay.

**A. In order to operate the terminal you have to have this license.**

Q. So Mr. DeMaio had no prior experience with the oil business or oil terminals. Is that right?

**A. No, but he knew how to run a company,**

**because that's what he had been doing.**

Q. Did you discuss with him an investment in the company?

**A. Well, I told him I would lend him the money to buy the company. I also said that he should look at Mr. Cirillo and Mr. Hritz. Because I had met Mr. Hritz through Mr. Cirillo and they were two capable people running a terminal. So as long as he knew financially how to run the company, he had the people that could physically run it for him.**

Q. Did Mr. DeMaio -- strike that.

Had Mr. Hritz already been at the terminal?

**A. Yes.**

Q. Do you know -- I want to focus my time period on the discussions you had with Mr. DeMaio about possibly purchasing the terminal, which I'm gathering is somewhere around 1996-1997.

**A. No, '96.**

Q. Okay. Did Mr. DeMaio have the resources to purchase the terminal on his own?

**A. No.**

Q. Did you discuss with him at all a direct investment in the terminal?

**A. No. I said I would lend him the money.**

**I didn't want to invest in the terminal.**

Q. Why didn't you want to invest in the terminal?

**A. It's just something I didn't want to put up with.**

Q. Did you ultimately lend him the money to purchase the terminal?

**A. Yes.**

Q. And how much money did you lend him?

**A. Initially, it was about a million and a half dollars.**

Q. Did that increase?

**A. Yes.**

Q. To how much?

**A. At its peak, probably about $9 million.**

Q. Were these loans directly to Mr. DeMaio?

**A. No, it was to the terminal.**

Q. Let's back up. Prior to the -- I gather Mr. DeMaio -- or the terminal was actually purchased from Mr. Silverberg. Correct?

**A. Yes.**

Q. Okay. Before that happened, what kind of due diligence, if any, was done in terms of ascertaining the condition of the terminal, the value

resources to do that work itself?

A. **It did not. No.**

Q. Okay. And how much money was lent?

A. **I'm not sure of the amounts but it was large.**

Q. Can you give me an approximate figure?

A. **I can't. It's 12 years ago.**

Q. Who lent the money? Who was the lender?

A. **One of my companies.**

Q. It wasn't you personally, right?

A. **No.**

Q. And the money was lent to TVI. Is that right?

A. **Yes.**

Q. Were there loan documents drawn up for that particular loan?

A. **I believe so.**

Q. Where would those documents be today?

A. **As I said previously, probably in dead storage.**

Q. Did there come a time when yet further money was lent to the terminal by you or any one of your companies?

A. **Yes.**

Q. When was that?

A. **It was all throughout the '90s. They needed money for remediation and for replacement of pumps and work on the main house.**

MR. BROWN: On the main what?

THE WITNESS: The main house. The rack house. Whatever you call it.

Q. Can you tell us how much money you lent at any given time?

A. **It was just millions of dollars.**

Q. And every time that you lent them money was there a loan agreement drawn up?

A. **Yes.**

Q. Would it be fair to say that all of these agreements are in storage?

A. **Honestly, after 12 years, 10 years, it's hard to say.**

Q. Have you lent the company money recently? Like say within the last five years?

A. **The last time I lent them money was in -- I think it was '03, when they had to finish the work on the south dock. I have not lent them money since then.**

Q. How much money did you lend them in '03?

A. **I'm not sure. It was a few million dollars.**

Q. How much does TVI owe you now, all totalled?

A. **I'm not sure if it's three or 4 million.**

Q. Is the company paying you back on a regular basis?

A. **Whenever I request it.**

Q. What -- do you have a methodology about when you request money?

A. **It's based on my needs.**

Q. Do you have any loan documentation, either -- strike that.

Is there any loan documentation in the files of any of your companies? As we sit here today.

A. **I have to check.**

Q. What are the possibilities as to where this information would be?

A. **I have no idea. I have to check.**

Q. Other than Eastern Energy Fuels --

A. **Eastern Energy Fuels did not make loans to the terminal.**

Q. Right. You mentioned that. Clark

Dodge, did they make any loans to the terminal?

A. **Did not.**

Q. Are there any other companies that are still in existence today that have lent money to the terminal in the past?

A. **No.**

Q. Do you require TVI to provide you financial information on a periodic basis?

A. **I go down to the terminal once a year and I look at their financials, when they are available.**

Q. Do you provide any consulting work to TVI?

A. **No.**

Q. Did you ever provide any consulting work to them?

A. **Nope.**

Q. Is it fair to say that when the terminal was purchased by Mr. DeMaio in 1998, that was capitalized via loans through you, or one of your companies?

A. **Yes.**

Q. Okay. Was Mr. Carpenter your attorney for purposes of these loans, in terms of drawing up documentation?

**drill holes and do samples and delineate. There was a whole process going on. It just took a long time.**

Q. Did you fund that remediation work, too?

A. **I lent them the money for that. Yes.**

Q. Was that remediation work that had to be done by the seller or by the buyer?

A. **It was by both of them. Shared by the seller and by the buyer.**

Q. How was that -- how is it determined that remediation work had to be done?

A. **Well, from what I understand, to clear title in Jersey you have to have a remediation plan accepted by the DEP. In order to do that, you have to hire a remediation company that does the research, explains what's gone on on the properties, take samples.**

Q. And was the funding -- strike that.

Was it agreed, in connection with the purchase, that you would fund the remediation?

A. **No. It was just I would lend them money. They used it for whatever.**

Q. You would lend the money to the buyer?

A. **Yes.**

Q. Which was TVI. Correct?

A. **That's correct.**

Q. You had indicated that you had asked Sal to attend and be on-site with respect to the '03 damages, or collapse of the south dock. Was Sal paid a consulting fee for that?

A. **No.**

Q. He was just doing it on his own time?

A. **Yes. I didn't pay him any consulting fees. I don't know if TVI did.**

MR. CLYNE: I'm going to reserve my right to recall the witness. I have some questions regarding the loans of the facility. I believe the loan documents should have been produced, independent of the subpoena, by Terminal Ventures. But subject to that reservation, I have no further questions.

THE WITNESS: I can tell you, you will not see me again. I promise you that. I'll hire outside counsel. I'll fight you tooth and nail. You know why? Because you're not going to waste my time.

MR. CLYNE: Fair enough.

THE WITNESS: If this thing had one iota to do with your vessel, your customer ruining the terminal, I'd give it to you. It has nothing to do with anything. I therefore protest. This is punic and unjustified. I will not come back. I

promise you.

MR. CLYNE: We'll see if a court order is required to bring you back.

THE WITNESS: I will fight it. I'm telling you right now.

MR. CLYNE: Thank you.

MR. BROWN: I have nothing further.

MR. SEMENORO: No questions.

(Deposition adjourned at 3:20 p.m.)

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Mary Jo Monteleone (CP)

MARY JO MONTELEONE, C.C.R.
Certificate No. XI01370
Notary Public of the State of New Jersey
My Commission expires March 7, 2009

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

-------------------------------------------------------x

**Index No. 08-3850 (JLL) (CCC)**

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Docket No. 08-3850 (JLL)

MASEFIELD INTERNATIONAL INC.,
Plaintiff(s),
-vs-
TERMINAL VENTURES, INC.,
Defendants
Third-Party Plaintiff,
-vs-
MASEFIELD AG ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY and JOHN DOE,
Third-Party Defendants.

Deposition of:
JEFFREY PRESSMAN

A. BACCARO ASSOCIATES, LLC
Certified Court Reporters
120 Morris Avenue
Springfield, New Jersey 07081
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: office@abaccaroassociates.com

- - -

TESTIMONY UPON ORAL EXAMINATION OF

JEFFREY PRESSMAN

Thursday, April 23, 2009

- - -

REPORTED BY: MARY JO MONTELEONE, CCR

- - -

A. BACCARO ASSOCIATES, LLC
Court Reporting Services
120 Morris Avenue
Springfield, New Jersey 07081
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: reporters@abaccaroassociates.com

- - -

T R A N S C R I P T of testimony taken stenographically pursuant to Superior Court Rules of Practice and Procedure by and before **MARY JO MONTELEONE**, a Certified Court Reporter and Notary Public of the State of New Jersey, at the offices of DOYLE & DOYLE, ESQUIRES, 636 Morris Turnpike, Short Hills, New Jersey, commencing at approximately 12:30 p.m.

- - -

A P P E A R A N C E S:

HILL, RIVKINS & HAYDEN, ESQUIRES
45 Broadway
New York, New York
By: ROBERT G. CLYNE, ESQUIRE
LAUREN E. KOMSA, ESQUIRE
Appearing on behalf of the Plaintiff, Masefield International Inc. and Third-Party Defendant, Masefield AG

DOYLE & DOYLE, ESQUIRES
636 Morris Turnpike,
Short Hills, New Jersey 07078
By: GERARD S. DOYLE, JR., ESQUIRE
DAVID D. GABEL, ESQUIRE
Appearing on behalf of the Defendant, Third Party Plaintiff, Terminal Ventures, Inc.

CHALOS, O'CONNOR & DUFFY, ESQUIRES
366 Main Street
Port Washington, New York 11050
By: TIMOTHY SEMENORO, ESQUIRE
Appearing on behalf of the Defendant(s), Aral Wind Ltd.

GIBBONS, P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, Pennsylvania 19103-2769
By: THOMAS S. BROWN, ESQUIRE
Appearing on behalf of the Third-Party Defendant, Liberty Mutual Insurance Company

A. **Yes.**
Q. Do you understand these instructions?
A. **Yes.**
Q. Have you ever been deposed before?
A. **Yes.**
Q. How many times?
A. **Five or six.**
Q. In connection with what matters?
A. **Various legal matters. Lawsuits in the oil business.**
Q. Okay. We'll come back to that. Let me first get some background information. By whom are you employed?
A. **Terminal Ventures, Inc..**
Q. What is your position there?
A. **Vice president of finance.**
Q. What are your duties and responsibilities as the vice president of finance?
A. **Monitor the financial situation of the company, secure financing, government reportings, cash flow, accounts receivable.**
Q. Do you have any responsibilities with respect to insurance?
A. **Yes.**
Q. What are those responsibilities?

A. **To procure adequate insurance for the terminal.**
Q. Any other duties and responsibilities that you could think of?
A. **Not off the top of my head.**
Q. How long have you held this position?
A. **Since mid 1999.**
Q. How many officers are there of TVI? I'm going to use TVI as short for Terminal Ventures Inc., if that's okay with you.
A. **That's fine.**
Q. And who are they?
A. **Fernando Marquez, M A R Q U E Z. He's the president. Andrew Hritz, vice president, and I'm listed as secretary/treasurer on the founding documents.**
Q. Mr. Marquez, is he -- does he show up at the terminal regularly?
A. **No, he does not.**
Q. Where does he reside?
A. **I believe he resides in the Bahamas but I'm not certain.**
Q. But do you have a reporting relationship to him?
A. **We communicate.**

Q. On a daily basis?
A. **As needed.**
Q. As needed. Okay.
Over the last year or two, how often, on average, would you communicate with Mr. Marquez?
A. **Several times a month.**
Q. Is there somebody that's the person in charge at the terminal on a day-to-day basis?
A. **Mr. Hritz or myself. We're always there.**
Q. How long has Mr. Marquez been the president of TVI?
A. **That I don't recall, but quite some time, though.**
Q. Do you know why he's the president of the company?
A. **Because he's the president. I really don't understand your question.**
Q. I'm curious as to why the president of the company is someone that lives in the Bahamas rather than having a hands-on management role of the company.
A. **He helps with relationships, things of that nature. I mean, you know, and it's worthwhile for us to have him.**

Q. But he doesn't manage on a daily basis; is that right?
A. **No, he's not a hands-on manager.**
Q. Who is the present owner of TVI?
A. **Vito De Maio.**
Q. He is the present owner?
A. **He owns the stock, yes.**
MR. BROWN: Who?
THE WITNESS: Vito De Maio.
Q. Who is Mr. De Maio?
A. **Mr. De Maio is a very sick man who actually was -- I don't know -- you see, that's when Mr. Marquez became president. Mr. DeMaio kind of resigned as president, due to health reasons. He's got a bad heart. The terminal pays him a minimal salary.**
Q. To do what?
A. **Sort of like retirement plan. Help cover his overheads in life.**
Q. Do you have any ownership interest in the company?
A. **No.**
Q. Did you ever have any ownership interest in the company?
A. **No.**

experience.

A. I graduated Syosset High School in 1964. I went to two years of State University at Farmingdale and got an associate degree from there. From there I went to -- I don't know the new name of the college. The old name used to be Jersey City State College. All right? And I believe I graduated there in 1971.

Q. You earned a degree?

A. Yes, in economics.

Q. Okay.

A. While I went to college, primarily at night, I was working in an accounting firm called Speduto, Spector. And I left there -- I think I left in like '73 or '74. From there I went to work for a company called Stinnes, S T I N N E S, Corporation. And they opened up an oil division and they transferred me up to the oil division.

Q. Was that in New Jersey?

A. No, Manhattan. I stayed there until about '83.

Q. Were you doing --

A. No -- '82.

Q. What kind of work were you doing for Stinnes?

A. I was the chief financial officer there. From there I went to Enron for approximately two years. I was the treasurer over there. I left there and I started Anthony Petroleum.

Q. What years did you work at Enron?

A. For two years after I left Stinnes.

Q. I'm sorry, just approximately --

A. Approximately '83 and '84. Maybe into '85. I'm not certain of the years. As you get older life gets tough.

I think some time in '85 I started Anthony Petroleum. That ran until about '92.

Q. What was the business of Anthony Petroleum?

A. A petroleum trading company.

Q. You were the owner of the company?

A. Yes, owner.

Q. Did you actually do trading yourself?

A. Yes. I was with Martin Bierbaum for approximately a year which was a money brokerage company. They wanted to open up an oil desk. Then I went to work in Russia for approximately two years. '97 -- '96 through early '98.

Q. What were you actually doing in Russia?

A. We set up a telephone communications

company. I was one of the CFOs that they had there. The company was called Nursat.

Q. It was in Russia that you met Mr. De Maio, correct?

A. Correct.

Q. Okay.

A. From there I went to work at Terminal Ventures, in mid '99.

Q. Was it Mr. De Maio that offered you a job there?

A. Yes.

Q. You started, you said, in mid '99, correct?

A. Right.

Q. And at the time you started, Mr. De Maio was the president of the company?

A. He was the president, yes.

Q. And did -- at that time was it called Terminal Ventures, or was it called Eastern Terminals?

A. The company has always been called Terminal Ventures. That's the legal corporate name for the company.

Q. Is Eastern Terminals a trade name?

A. Everybody in the industry -- the

terminal was built in 1950. It was always known as Eastern Terminals. If anybody calls the terminal they still call us Eastern Terminals. It's just a misnomer.

MR. DOYLE: Put up a sign.

THE WITNESS: It was appointed by Jack Silverberg for the city of New Jersey.

Q. I was going to get into the terminal. The terminal was built in 1950?

A. In the 1950s. It could be anywhere from 1951 to 1959.

Q. Mr. Silverberg was the original owner?

A. No.

Q. Okay.

A. The company was originally owned by Whalen. They went bankrupt, and Mr. Silverberg bought it from Whalen.

Q. Do you know approximately what year he bought it?

A. Sometime in the '60s.

Q. Do you know how long he owned the terminal?

A. Right up until we -- not we -- Mr. De Maio actually purchased the terminal.

Q. What year was that?

A. **I believe it was in January of 1998.**

Q. And then you said you started in mid '99, correct?

A. **Correct.**

Q. There were two marine docks at Terminal Ventures, correct?

A. **I'm sorry?**

Q. There's two marine piers at -- two marine docks. There's a north dock and a south dock, correct?

A. **Correct.**

Q. And the north dock is a barge dock, correct?

A. **Yes.**

Q. And the south dock is a vessel/barge dock, correct?

A. **That's how we refer to them, yes.**

Q. Do you know how old those docks are?

A. **No.**

Q. Do you know if they were there prior to the tank -- terminal being built in the '50s?

A. **No.**

Q. Are you familiar with the files that are maintained at Terminal Ventures?

A. **Somewhat.**

Q. At the time that -- I realize this is before you started, but at the time that Mr. De Maio bought the terminal, do you know whether any sort of a due diligence study was done with respect to the terminal?

A. **I have no idea.**

Q. Are you aware of whether or not there were any documents at the facility that -- at Terminal Ventures that might address the acquisition of the terminal by Mr. De Maio and any due diligence that might have been done?

A. **I have no idea.**

Q. Do you know Mr. Andrew Hritz?

A. **Yes, I do.**

Q. He's the operations manager at the terminal?

A. **Yes.**

Q. Was he there at the time that you started?

A. **Yes, he was.**

Q. Do you know how long Mr. Hritz worked at Terminal Ventures?

A. **I would believe he's been there since '96 or '97. He was there prior to the final takeover at the time of the terminal.**

Q. Do you know Mr. Sal Di Mauro?

A. **Yes, I do.**

Q. Who is Mr. Sal Di Mauro?

A. **Mr. Di Mauro owns a company called American Oil Consultants. He helps us do some marketing.**

Q. Does he have an office at TVI?

A. **Yes, he does.**

Q. Does he show up there on a daily basis?

A. **Yes, he does.**

Q. How about Mr. Joe Di Mauro? Does he show up on a daily basis?

A. **No. Excuse me.**

(Brief recess.)

Q. Correct me if I'm wrong, but I think that you had indicated that Mr. Joe Di Mauro's relationship with TVI is as a lender. Is that correct?

A. **Yes.**

Q. Is there any other relationship that he has other than as a lender with the company?

A. **No.**

Q. Can you explain to me how that relationship works in terms of the lending that he does, the lending activity?

A. **You'll have to be more specific.**

Q. Are there any loans outstanding to Mr. Di Mauro right now?

A. **Yes, there are.**

Q. Okay. And how much money does the company owe him?

A. **At the present time?**

Q. Yes.

A. **Approximately 2.5 million.**

Q. Are there loan agreements that are -- that memorialize that?

A. **There are notes.**

Q. Do you maintain documentation with respect to those notes and the amounts that are paid off on them?

A. **Yes.**

Q. Do you pay him off on a regular basis?

A. **No. For a long time the terminal wasn't cash flow positive and couldn't take it back. He continued to finance us. Now the terminal is in -- since '94, the terminal is finally holding its own.**

Q. Since '94?

A. **I'm sorry, since 2004. And we can pay him back. Over a period of time he probably advanced**

**the terminal in excess of $9 million.**

Q. What period would that be?

A. **From -- I would have to say it goes back to like '96, '97, when TVI was formulated.**

Q. Did he have a role in formulating TVI?

A. **Not to my knowledge. No.**

Q. Does he have a relationship, or did he have a relationship with Mr. De Maio?

A. **Yes.**

Q. A business relationship. And what was the nature of that relationship?

A. **They were life long friends. And Mr. De Maio wanted to get involved in the oil business. Mr. Di Mauro got him actively involved.**

Q. Do you prepare financial reports for the company on a periodic basis?

A. **Just annually.**

Q. What type of reports do you prepare?

A. **Pretty much it's just a P & L and balance sheet, which relates to the corporate tax returns.**

Q. Does TVI have any bank loans outstanding?

A. **No.**

Q. So any lending that occurs with respect

to TVI is through Mr. Di Mauro. Is that right?

A. **Yes.**

Q. Does TVI have an outside auditing firm?

A. **Yes.**

Q. And who is that?

A. **Excuse me?**

Q. Go ahead.

A. **Can you define "auditing firm"?**

Q. Has TVI, for any reason, engaged outside auditors?

A. **We have an outside accounting firm.**

Q. Who is that?

A. **Michael De Vine.**

Q. Where is he located?

A. **Pelham, New York.**

Q. What is his role as the outside accounting firm?

A. **He prepares our corporate returns.**

Q. Okay. I'm going to focus my questions on -- let me ask a couple of general questions about insurance and TVI, and then I'm going to focus on the vessel pier for a period, southbound.

In terms of insurance, what type of insurance policies does TVI maintain?

A. **Property, inventory -- well, it's under**

**the cargo -- auto, disability, casualty. I can't recall.**

Q. How about liabilities?

A. **That's casualty. That's how I view it.**

Q. Terminal operator's liability policy you refer to as casualty policy?

A. **Right. That's mandated by the state.**

Q. Okay. Does TVI have a broker that they engage?

A. **Yes, we do.**

Q. Who is that?

A. **Joseph Sheridan. He works for Hugh Wood and Associates.**

Q. How long has Mr. Sheridan been the broker for TVI?

A. **I would say since 2004, I believe. But he was at another company before he went to Hugh Wood. He was our broker at Willis Marine, and then he left, and I gave him the policies when he moved to Hugh Wood.**

Q. Okay. Did you deal with any brokers before Mr. Sheridan at your time at TVI?

A. **Yes. The Haze Group. They were out of Massachusetts. And Hagadorn & Company.**

Q. What years did you engage the Haze

Group as TVI's broker?

A. **I would venture to say somewhere the years 2000, 2001, when Mr. Sheridan took over the insurance. And Hagadorn was from the time we purchased the terminal -- "we" meaning Mr. De Maio. I didn't buy it.**

Q. Understood.

A. **Until 2000 or 2001 Hagadorn had the insurance. So '98 through 2000, 2001.**

Q. It would have been Hagadorn?

A. **Hagadorn.**

Q. Before that was the Haze Group -- after that -- I'm sorry.

A. **After.**

Q. Was Mr. Sheridan with Hagadorn?

A. **No. Mr. Sheridan -- my relationship with Mr. Sheridan started from the time he was at Willis Marine.**

Q. Understood. Who was your contact at Hagadorn?

A. **He is deceased now. Pete Anselmo.**

Q. I want to focus your attention to the period when you first started with the company. Did you become aware -- I believe you said that was mid '99. Is that right?

Q. What was that case about?
A. **That was about a remediation problem at the terminal.**
Q. What was the dispute between the two companies?
A. **Basically, they said we didn't remediate the property properly, and they didn't want to be the responsible party to the state. We said we had been remediating it. They blocked the submission of it to the state. We finally resolved that case.**
Q. When was that?
A. **Sometime last year. It resolved itself probably in August of '08.**
Q. What was the specific remediation issue?
A. **It's under the state remediation plan. I'm not that familiar with it. I don't get involved in the remediation area.**
Q. Would that be Mr. Hritz's area?
A. **Yes.**
Q. What was the subject of your deposition in that case?
A. **Pretty much financial.**
Q. Is that case pending in --
A. **It's resolved.**

Q. I'm sorry. It's resolved. Was it settled?
A. **Yes.**
Q. Did TVI pay Eastern money?
A. **TVI didn't pay anything.**
Q. Did Eastern just drop the case?
A. **Yes.**
Q. Was that case pending in New Jersey?
A. **Is it pending?**
Q. Was it pending in New Jersey?
A. **Yes.**
Q. In state court or federal court?
A. **I believe it was state court. Yes.**
Q. Who represented TVI in that case?
A. **Mc Cusker again.**
Q. Who represented Eastern?
A. **I can't remember the law firm. I don't remember. Himmelmann, H I M M E L M A N N. Himmelmann something.**
Q. That's the third case. Any others?
A. **I'm having difficulty recalling at this time.**
Q. Any others involving TVI?
A. **I don't believe so.**
Q. You're familiar with a company called

Masefield International. Is that right?
A. **Yes.**
Q. Did there come a time in 2007 where Masefield International entered into a contract with Terminal Ventures for storage and movement of biodiesel out of the TVI facility?
A. **Yes. But I believe the product was more than just biodiesel.**
Q. What other products were involved?
A. **I believe they had some ultra low sulfur diesel at the terminal also.**
Q. Were you involved in the initial negotiations and discussions with Masefield?
A. **No.**
Q. Do you know who was?
A. **We used Mr. Di Mauro, who is our consultant, to work through the negotiations.**
Q. Was that Sal Di Mauro?
A. **Yes.**
Q. Okay. Prior to the signing of a contract with Masefield, did you meet -- have any meetings with Masefield yourself?
A. **To the best of my recollection, I didn't have any meetings. I was laid up. I fell on black ice at the terminal and tore up my quadricept,**

**and at the time of the negotiations I wasn't present at the office. Maybe in April or May I started coming up, on a limited basis.**
Q. What was your first involvement with Masefield?
A. **I provided Mr. Di Mauro with a boilerplate contract that we use. And pretty much by the time I got back most everything was done. I may have -- I probably had some conversations with -- relating to different parts of the contract but I don't recall.**
Q. Have you seen the Masefield Terminal Ventures agreement dated March 27, 2007?
A. **Yes.**
Q. Do you know who from the TVI side had principal responsibility for drafting the contract?
A. **Like I said, we have a boilerplate contract. Okay? And pretty much the contracts are standard for everybody. There was some minor changes made to the contract, which I would believe Mr. Hritz would have called me. We kind of agreed on different things.**
Q. If this was March of 2007, or the end of March 2007 when the contract was signed, at that point you were laid up, right?

The first entry on the first page of Pressman-23 is an entry, "New pipeline north dock."

A. **Right.**

Q. Can you explain what that is and why that's part of the claim?

A. **We ran new pipe, large pipe, to accommodate Masefield. Also to keep make it so their product wouldn't get mixed with PSE&G's product, because it could contaminate their product. So we ran a segregated line to accommodate them at the north dock.**

Q. When was that done?

A. **I believe back in October. Shortly after the collapse. Started in December. We bought the pipe and everything else. It was welded in in February of '08. Actually, that's when I got the bill. It was actually probably the work was done in December and January.**

Q. And then focussing your attention to the loss profits clause by contract cancellation -- I apologize, but this is really the first time I'm looking at this. It was produced today.

A. **That's no problem.**

Q. I want to make sure I understand it. Can you walk us through that? The first entry is for

sales revenue, fiscal year September 30, 2007. How are you deriving that figure?

A. **Whatever I would have billed Masefield for. Less what my average cost of goods sold was. Based upon my 2007 numbers. It works out to 38.32 percent profit. You do the multiplication.**

Q. Okay. The cleaning cost entry on this page entitled, "Lost profits caused by Masefield Contract Cancellation," cleaning costs of $300,000, where does that come from?

A. **That's basically the estimate in there because Masefield was to return the tanks to Bear Steel when they pulled out. Okay? It was just a pure estimate to bring the tanks back to Bear Steel.**

MR. CLYNE: Just give me a minute. I may be done.

(Off-the-record.)

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

MARY JO MONTELEONE, C.C.R.
Certificate No. XI01370
Notary Public of the State of New Jersey
My Commission expires March 7, 2009

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

**Index No. 08-3850 (JLL) (CCC)**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

---------------------------------------------------------x

# EXHIBIT C



UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Docket No. 08-3850 (JLL)

MASEFIELD INTERNATIONAL INC.,

Plaintiff(s),

-vs-

TERMINAL VENTURES, INC.,

Defendants Third-Party Plaintiff,

-vs-

MASEFIELD AG ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY and JOHN DOE,

Third-Party Defendants.

Deposition of:

ANDREW HRITZ
(VOLUME I)

A. BACCARO ASSOCIATES, LLC
Certified Court Reporters
230 Sherman Avenue
Berkeley Heights, New Jersey 07922
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: office@abaccaroassociates.com

- - -

TESTIMONY UPON ORAL EXAMINATION OF

ANDREW HRITZ

Thursday, June 25, 2009

- - -

REPORTED BY: MARY JO MONTELEONE, CCR

- - -

A. BACCARO ASSOCIATES, LLC
Court Reporting Services
230 Sherman Avenue
Berkeley Heights, New Jersey 07922
Phone: (973) 467-7890 Fax: (973) 467-8822
E-Mail: office@abaccaroassociates.com

- - -

T R A N S C R I P T of testimony taken stenographically pursuant to Superior Court Rules of Practice and Procedure by and before MARY JO MONTELEONE, a Certified Court Reporter and Notary Public of the State of New Jersey, at the offices of GIBBONS, P.C., One Gateway Center, Newark, New Jersey, commencing at approximately 10:00 a.m.

- - -

A P P E A R A N C E S:

HILL, RIVKINS & HAYDEN, ESQUIRES
45 Broadway
New York, New York
By: ROBERT G. CLYNE, ESQUIRE
LAUREN E. KOMSA, ESQUIRE
Appearing on behalf of the Plaintiff, Masefield International Inc. and Third-Party Defendant, Masefield AG

DOYLE & DOYLE, ESQUIRES
636 Morris Turnpike,
Short Hills, New Jersey 07078
By: GERARD S. DOYLE, JR., ESQUIRE
DAVID D. GABEL, ESQUIRE
Appearing on behalf of the Defendant, Third Party Plaintiff, Terminal Ventures, Inc.

GIBBONS, P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, Pennsylvania 19103-2769
By: THOMAS S. BROWN, ESQUIRE
Appearing on behalf of the Third-Party Defendant, Liberty Mutual Insurance Company

- I N D E X -

| WITNESS NAME | PAGE |
|---|---|
| ANDREW HRITZ: | |
| By: MR. CLYNE | 7 |

- E X H I B I T S -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hritz-1 | Exhibit 10 to TVI's Document Production | 45 |
| Hritz-2 | Sketch | 45 |
| Hritz-3 | Letter dated 11/5/03 to Mr. Hritz from Irwin Rowe | 88 |
| Hritz-4 | Sketch | 94 |
| Hritz-5 | Sketch | 113 |
| Hritz-6 | Letter of Protest dated 11/1/07 | 145 |
| Hritz-7 | Sketch | 152 |

- R E Q U E S T S -

| PAGE | LINE |
|---|---|
| 34 | 15 |

A N D R E W H R I T Z:
residing at 702 Essex Court,
Brewster, New York,
having been duly sworn by the Notary Public,
testifies as follows:

EXAMINATION BY MR. CLYNE:

Q. Good morning, Mr. Hritz. My name is Robert Clyne. To my right is my associate, Lauren Komsa. We represent the plaintiff, Masefield International, in this matter.

I'm going to ask you a series of questions today and ask you to give a verbal response. The court reporter can't take down nods. Please let me finish the question, even though you'll want to answer it, because she can't take us both talking at the same time. She can't take it down. So if you don't understand something let me know. I'll be happy to rephrase it. If you need a break at any time, let me know. Okay?

A. Thanks.

Q. Could you tell us by whom you're employed?

A. Terminal Ventures, Inc..

Q. What is the business of Terminal Ventures, Inc.?

A. It's an oil storage facility.

Q. What is your position there?

A. Vice president of operations.

Q. What are your duties and responsibilities in that position?

A. Oversee the operations of the terminal.

Q. How long have you held that position?

A. Since 1996.

Q. Could you just briefly outline your educational experience and your work background for us?

A. Okay. I graduated from high school, went to the University of Oklahoma for two years and majored in civil engineering. Didn't do so well in one course, ended up in Vietnam for a couple years, came back, changed over in business management, economics minor, from Hofstra University. Graduated from Hofstra engineering with a degree in management/economics. I had a couple of my own companies. In Panama, in other places. I've been --

Q. Let's break it down. Let's start with after you graduated. What year did you graduate from Hofstra?

A. I graduated in 1980 but I was working.

A. **The existing waler, yes. In that one section.**
Q. Who was that?
A. **Derek Marine.**
Q. Is that during the repairs?
A. **Yes.**
Q. Following the Aral Wind docking?
A. **Yes.**
Q. In connection with this particular incident following the Aral Wind docking, did you ever determine what actually happened to cause the walking?
A. **Yeah. The deadmen snapped.**
Q. They snapped?
A. **Yeah.**
Q. Was it Trevcon that dug in the area behind the actual dock itself to get at the deadmen? Was it the tie rods that snapped?
A. **Yes. Let me explain it. When they were dredging the river, bringing up the debris for the material after the Aral Wind, we found two of the -- kind of right in front of where the Yokohama was, in that area, we found two of the deadmen.**
MR. DOYLE: I thought the deadmen were the giant pieces of concrete.

THE WITNESS: Pardon me?
Q. The couplers?
A. **The couplers -- not the couplers, the end that meets the waler. They are about two and a half feet long. I have two of them in my garage. The nuts are still on, the threads are formidable. There's a little bit of corrosion where the seal meets the thing, which is only natural. But the tie rod is this big and both of them are sheered. It's not bending or whatever it is.**
Q. Where is that material right now?
A. **In my garage at the terminal.**
Q. When this was discovered, did you provide that information to the insurance company?
A. **Sure.**
Q. Did they take photographs?
A. **Somebody came from the insurance company and took photographs, after they were recovered.**
Q. When the deadmen were dug up, was there -- were the tie rods surveyed?
MR. DOYLE: Which? Could you --
MR. CLYNE: The tie rods run from the deadmen.
MR. DOYLE: I know what they are. We

have lots of deadmen and dug up. What period of time?
MR. CLYNE: I'm talking about subsequent to the Aral Wind docking.
THE WITNESS: We dug them up during the investigation -- pardon me -- the contractor putting in new rods. The new rods are next to existing ones when he put them in. And they are clean and they are threaded. We left them in the ground. The contractor left them in the ground and put all brand new ones.
MR. CLYNE: Let's stop there. Thank you.
(Deposition adjourned at 3:20 p.m.)

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Mary Jo Monteleone (CP)

MARY JO MONTELEONE, C.C.R.
Certificate No. XI01370
Notary Public of the State of New Jersey
My Commission expires March 7, 2009

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

**Index No. 08-3850 (JLL) (CCC)**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

---------------------------------------------------------x

# EXHIBIT D

Robert G. Clyne
Lauren E. Komsa
HILL RIVKINS LLP
Attorneys for Plaintiff
Masefield International, Inc.
102 South Broadway
South Amboy, NJ 08879
(732) 838 0800

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MASEFIELD INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>TERMINAL VENTURES INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS INC., and CLARK DODGE AND COMPANY INC.<br>Defendants.<br>_______________<br>TERMINAL VENTURES, INC.<br><br>Third Party Plaintiff,<br><br>-against-<br><br>MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE<br>Third Party Defendants. | Index No. 08-3850 (JLL)(CCC)<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, Masefield International, Inc., by and through its attorneys, Hill Rivkins LLP, as and for its Second Amended Complaint against the above-named defendants alleges upon information and belief as follows:

**PARTIES**

1. At and during all material times hereinafter mentioned, Plaintiff, Masefield International Inc. (hereinafter "Plaintiff" or "Masefield") was and now is a corporation organized and existing under the laws of Delaware with its principal place of business at 3050 Post Oak Boulevard, Suite 1330, Houston, Texas 77056.

2. At and during all material times hereinafter mentioned, defendant, Terminal Ventures, Inc. (hereinafter "Defendant" or "TVI") was and now is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 195 Howell Street, Jersey City, New Jersey 07306.

3. At and during all material times hereinafter mentioned, defendant Joseph DiMauro was and is a resident and citizen of the State of New York, with a residential address at individual residing at 18 Wrights Mill Road, Armonk, New York, 10504.

4. At and during all material times hereinafter mentioned, defendant, Eastern Energy Fuels, Inc. ("Eastern Energy" or "EEF") was and now is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2 Gannett Drive, Suite 410, White Plains, New York, 10604.

5. At and during all material times hereinafter mentioned, defendant Clark Dodge & Company Inc. ("Clark Dodge") was and now is a corporation organized and

existing under the laws of Florida, with its principal place of business at 2 Gannett Drive, Suite 410, White Plains, New York, 10604.

**SUBJECT MATTER JURISDICTION**

6. The subject matter jurisdiction of this Court is invoked under 28 U.S.C. §1333 as this matter is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

7. Alternatively, the subject matter jurisdiction of this Court is invoked under 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**FACTUAL BACKGROUND**

8. Plaintiff and Defendant entered into a Terminal Agreement No. 09/05-1001, with an attached schedule, both dated March 27, 2007, and signed on April 5, 2007 ("the Agreement"), which, *inter alia*, provided that Defendant would receive, store, deliver and/or transfer clean petroleum products or biodiesel or blends thereof at its terminal facility in Jersey City, New Jersey for and on behalf of Plaintiff. A true and correct copy of the Agreement is attached hereto as Exhibit A.

9. The Agreement further provides that Defendant would provide to Plaintiff "one safe port and one safe and always accessible berth…", and the Agreement further provides that the South Dock is capable of receiving a 700 foot long tanker with a maximum beam of 120 feet, maximum mean low water draft of 29 feet, and with a minimum loading rate of 2,500 US Barrels per hour.

10.     The Agreement further provided that TVI would have both the "South Dock" and the "North Dock" available, "24 hours/day, 7 days/week year round" and that the docks would be maintained in good working order.

11.     The "South Dock" at the TVI facility was the only dock capable of accommodating ocean-going vessels.  The "North Dock" was only capable of handling barges, and was unable to accommodate ocean going vessels.

12.     By its terms, the Agreement was to last two years, beginning in June 2007, and ending in June 2009.

13.     Defendant alleges that on or about October 17, 2007 there was an incident with respect to the M/V Aral Wind that allegedly damaged the South Dock at the terminal which is the only dock that can accommodate ocean-going vessels.

14.     Notwithstanding the alleged incident on October 17, 2007, Plaintiff was not notified of the incident or the unavailability of the South Dock until November 1, 2007.

15.     It subsequently became evident that the South Dock was in such a poor condition that the warranties, promises, and undertakings made in Paragraphs 6, 7, and 8 of the Agreement constitute misrepresentations which were made solely to induce Plaintiff into entering into the agreement and upon which plaintiff relied to its detriment.

16.     It has further subsequently become evident that at all times relevant, TVI was insolvent in that it was not paying its debts as they became due.

17.     At Defendant's request Plaintiff advanced funds on December 12, 2007 in the form of pre-paid storage in the amount of $305,820.00 in order to assist Defendant in financing the dock repairs to the South Dock.

18.     Defendant requested this money because it was insolvent and undercapitalized at the time it contracted with TVI, such that it was unable to pay for repairs of the dock in the normal course of business.  TVI was unable to commence repairs at the South Dock until it received the loan from TVI.

19.     Notwithstanding the financial aid (loan) provided in the form of pre-paid storage fees, the South Dock remained unavailable for use by Plaintiff through the termination of the Agreement on June 30, 2008.

20.     During the period November 1, 2007 through June 30, 2008, Defendant misrepresented, to Plaintiff's detriment, that the South Dock was being repaired in an efficient and timely manner.

21.     The repairs were delayed due to TVI's insolvency and its inability to pay for repairs and/or pay contractors performing the repair work at the South Dock.

22.     During the period November 1, 2007 through June 30, 2008, Plaintiff was given various indications as to when the South Dock would become operational again and, relying on such information, nominated certain vessels including the M.V. Clipper Trojan, M.V. Kristen Knutsen, M.V. Destiny 1, M.V. Clipper Kylie,  M.V. Panama Flota, M.V. Stolt Candor, M.V. LS Jacoba, M.V. Amundsen Wind, M.V. Basat and the M.V. Dzintari to call at the South Dock at Defendant's facility, none of which vessels were able to call at the South Dock due to its unavailability.

23. Also during the period November 1, 2007 through June 30, 2008, having only the North Dock available to it, Plaintiff was required to undertake costly lightering and reverse lightering operations in order to bring product into the terminal, and remove product from the terminal.

**ALTER EGO ALLEGATIONS**

24. At all times relevant hereto, Joseph DiMauro was the alter ego and actual, beneficial and/or equitable owner of TVI in that he exercised complete dominance and control over all facets of TVI's operations and finances, such that TVI acted as a puppet in mechanical response to DiMauro's instructions, orders and demands. United Food and Commercial Workers Union v. Fleming Foods East, Inc., 105 F.Supp. 379 (D.N.J. 2000).

25. While DiMauro wanted to purchase the facility in his own name, he was barred from doing so as a result of his history of problems with the Internal Revenue Service ("IRS"). The IRS would not issue DiMauro an IRS 637 license, which is necessary in order to sell petroleum products in the United States. Instead, DiMauro formed TVI as an instrumentality by which he would be able to conduct this business, which he personally was legally unable to do.

26. After forming the company, DiMauro alone continually capitalized the company with minimal capital infusions on an as-needed basis, which proved to be inadequate for TVI's overall operating purposes. Evidence demonstrates that TVI did not have sufficient capital to fund issues that arose, which are inherent risks in running an oil terminal such as making dock repairs, performing environmental remediation, and cleaning oil spills, and so for each incident DiMauro alone would

advance further capital to TVI. No loan documentation was ever generated with respect to these capital infusions.

27. Following the collapse at the South Dock in 2007, DiMauro did not want to use his own funds, and so caused TVI to obtain a loan from Masefield in order to undertake the repairs.

28. Since DiMauro formed TVI, he claims to have "loaned" $ 9 million to TVI, although none of these capital contributions is documented. One the one hand, DiMauro has used these transactions to capitalize the company, yet has retained control to siphon funds directly.

29. Because DiMauro so pervasively controls the TVI operation by virtue of his loans, his so-called creditor status alternatively makes him the alter ego of TVI. Pearson v. Component Technology Corp. 247 F.3d 471, 495 (3d Cir. 2001); In re WorldClass Processing, Inc., 2007 WL 2541775 (W.D.Pa. 2007); Krivo Indus. Supply Co. v. National Distillers & Chemical Corp., 483 F.2d 1098 (5th Cir. 1973).

30. Since TVI's inception, DiMauro has personally controlled TVI, including its business operations and financial dealings, such that TVI has no separate existence, but is merely the instrumentality and conduit by which DiMauro could conduct business that he otherwise would be unable to conduct.

31. DiMauro abused the privilege of incorporation by using TVI to perpetrate injustice, to the detriment of its lawful creditors. Evidencing this abuse are the following acts or omissions:

a) Since DiMauro formed TVI in1997, TVI has failed to observe corporate formalities, as required by the law of the State of New Jersey. TVI has

never held a board of directors meeting, and does not maintain corporate records.

b) Since the time that TVI purchased the terminal, it has been grossly undercapitalized, and apart from the Masefield loan, has relied on DiMauro as its sole source of capital each time it is required to perform repairs, clean oil spills, perform environmental remediation, and deal with other such issues that presented themselves, which are inherent in running an oil terminal. As TVI spiraled deeper into debt and failed to make payments to its lawful creditors, DiMauro continued to siphon payments from TVI in spite of its week capital position and without any corporate control over payments to him at the same time. TVI's obligations to its true lawful creditors remained in arrears, or not paid at all. Trustees of Nat. Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk 332 F.3d 188, 198 -199 (3d Cir. 2003).

c) Since 2007, DiMauro and/or one of his various shell entities, have been siphoning funds from TVI, and have been receiving anywhere between $10,000 and $50,000 every 4-14 days. If for some reason DiMauro does not get paid on demand when he arbitrarily decides he would like to get paid in an amount that is also arbitrarily decided, he has testified that he will immediately foreclose on the terminal. This is so notwithstanding the non-existence of a single loan document or a mortgage reflecting him as a creditor of TVI.

d) DiMauro has personally assumed total control over TVI's business practices and transactions. By way of example only, DiMauro is personally responsible for the negotiation and execution of all of TVI's contracts, including the negotiation of the terminal agreement with Masefield. All of TVI's business decisions are made by DiMauro. DiMauro has the final say as to whether all potential contracts or transactions can be executed or consummated by TVI. TVI takes no corporate action without first receiving approval from DiMauro.

e) DiMauro has complete control over TVI's finances, and is the sole beneficiary of all income and revenue received and/or owned by TVI.

f) DiMauro personally controlled and directed the reconstruction of the terminal that took place beginning at the time of the South Dock collapse, and continued until at least the time that the Masefield /TVI contract was terminated. DiMauro made all decisions as to which contractors to hire and how the work was to be performed. DiMauro decided which contractors to pay, and if and when the contractors would get paid.

g) DiMauro dictated which companies were allowed to store product at the TVI terminal. Records indicate that DiMauro approved only those

companies which would in some way financially benefit him or one of his other various business entities.

h) TVI pays DiMauro's bills and debts directly. By way of example only, TVI pays for the health insurance for employees of defendant, Clark Dodge, an unrelated entity owned by DiMauro.

i) DiMauro's companies use TVI's business address and business license on government filings and applications, such as applications for a biodiesel license. For instance, Eastern Energy Fuels, which has received over 1.3 million dollars in transfers from TVI authorized only by DiMauro, shares the same office and business address as TVI.

j) Although DiMauro's testimony indicates that his childhood friend, Vito DeMaio, is the "sole shareholder" of TVI, it appears that Mr. DiMauro himself is the sole actual, beneficial, and/or equitable shareholder of TVI. At no time has DeMaio been involved with TVI and he has no authority to take corporate action, or to otherwise govern TVI's operations or management, all of which is determined by DiMauro.

k) TVI's current president, Fernando Marquez, is not a U.S citizen, and is unable to obtain a U.S visa. Mr. Marquez resides in the Bahamas, and rarely visits the United States due to his visa issues.

32. As a direct and proximate result of DiMauro's pervasive control and the misuse of such control, Masefield has been damaged as further set forth herein.

**AS AND FOR A FIRST CAUSE OF ACTION <u>FOR BREACH OF CONTRACT</u>**

**(Against Terminal Ventures Inc. and Joseph DiMauro)**

33. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 32 as if the same were fully set forth herein.

34. Although the Agreement fundamentally provides that Defendant would provide Plaintiff with access to and from its facility, for vessels with a maximum draft of 29 feet, the South Dock has been unavailable for use since the first notification of its unavailability on November 1, 2007.

35. Additionally, although the Agreement provides that TVI would maintain its facility in good working order, TVI failed to make repairs of the South Dock with any degree of dispatch, such that the South Dock did not become operational until at least March 2009.

36. By failing to make the South Dock available for use, Defendant breached its duties and obligations under the Agreement and is otherwise at fault.

37. Plaintiff performed according to the terms, covenants, and conditions of the Agreement.

38. As a result of Defendant's breaches and other failures, Plaintiff has incurred expenses for lightering, reverse lightering, barging, freight, inspection, demurrage, cleaning costs, vessel non-utilization costs, pre-paid storage costs and other expenses.

39. By reason of the premises, plaintiff has sustained damages, no part of which has been paid, in the amount of $3,489,922.40 exclusive of interest and costs.

**AS AND FOR A SECOND CAUSE OF ACTION FOR BREACH OF WARRANTY**

**(Against Terminal Ventures Inc. and Joseph DiMauro)**

40. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 39 as if the same were fully set forth herein.

41. The Agreement warrants that Defendant "shall provide one safe port and one safe and always accessible berth … during the term of the Agreement."

42. The Agreement further provides that the South Dock could accommodate vessels with a mean low water draft of 29 feet.

43. Notwithstanding the foregoing warranty, Defendant has failed to provide either a safe port or safe berth to accommodate vessels with a draft of 29 feet.

44. As a result of Defendant's breach of warranty, Plaintiff has incurred expenses for lightering, reverse lightering, barging, freight, inspection, demurrage, cleaning costs, vessel non-utilization costs, pre-paid storage costs and other expenses.

45. By reason of the premises, Plaintiff has sustained damages, no part of which has been paid, in the amount of $3,489,922.40 exclusive of interest and costs.

**AS AND FOR A THIRD AND ALTERNATIVE CAUSE OF ACTION FOR RESCISSION OF THE AGREEMENT (Against Terminal Ventures Inc.)**

46. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 45 as if the same were fully set forth herein.

47. As referenced above Defendant represented at the time that the agreement was entered into that the South Dock would be fit, well maintained and in all respects ready to accommodate vessels with a maximum draft of 29 feet.

48. The availability of the South Dock and its ability to accommodate vessels with a maximum draft of 29 feet was a material consideration upon which Plaintiff relied when entering into the agreement.

49. The representations regarding the condition of the South Dock as set forth above were false and known to be false by the defendant at the time of the negotiations and execution of the Agreement and were made solely for the purpose of inducing Plaintiff's reliance upon same. Furthermore, Plaintiff rightfully relied upon defendant's misrepresentations and false statements, believing them to be true, to its detriment.

50. By reason of the premises, Plaintiff is entitled to rescind the Agreement with Defendant, with Defendant receiving no benefit from same.

51. By reason of the premises, plaintiff has sustained damages, no part of which has been paid, in the amount of $3,489,922.40 exclusive of interest and costs.

**AS AND FOR A FOURTH**
**CAUSE OF ACTION**
**FOR CONVERSION**

(Against Terminal Ventures Inc. and Joseph DiMauro)

52. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 51 as if fully set forth herein.

53. The Agreement provides in Clause 7 for the removal of all materials including tank bottoms and line fill at termination. At the present time, Plaintiff has material in the form of tank bottoms and line fill in the approximate amount of 3,712 barrels with an approximate value of $589,345.05.

54. Although the Agreement provides for the removal of tank bottoms and Plaintiff has nominated the barge HT 100 or substitute to remove the tank bottoms, Defendant has rejected the nomination and steadfastly refused to return the tank bottoms in violation of the Agreement, thereby converting the material/tank bottoms and line fill for its own use.

55. As a result of Defendant's conversion, Plaintiff has incurred damages in the sum of $589,345.05 exclusive of interest and costs, no part of which has been paid although duly demanded.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT (N.J.S.A § 25:2-25 et seq.)**

(Against Terminal Ventures Inc., Joseph DiMauro, Eastern Energy Fuels, Clark Dodge, and Does 1-5)

56. Masefield realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 55 of the Complaint.

57. Pursuant to N.J.S.A 25:2-25 and N.J.S.A 25:2-27, Masefield is a creditor of Terminal Ventures Inc. ("TVI") within the meaning of N.J.S.A 25:2-21.

58. TVI is a debtor within the meaning of N.J.S.A. 25-2-21 because it is liable to Masefield for breach of contract, breach of warranty, and conversion, as further alleged in the Complaint herein, in the amount of $3,489,922.40.

59. Masefield has a "claim" against TVI, within the meaning of N.J.S.A. 25:2-21, and has had such claim since Masefield first notified TVI that it was in breach of the Agreement, on November 7, 2008.

60. Following this initial claim, TVI continued to breach the contract, despite its assurances to Masefield that it would comply with the Agreement.

61. On May 29, 2008, Masefield made a claim for damages against TVI in the amount of $1,463,945.52, seeking costs incurred from November 1, 2007 until April 30, 2008, due to TVI's failure to provide a safe berth in accordance with the contractual warranties, TVI's failure to maintain all facilities in good working order, and TVI's failure to perform maintenance so as to minimize impact on Masefield. More specifically, Masefield's May 29, 2008 claim sought damage associated with

lighter/ reverse lighter operations that became necessary due to the inaccessibility of TVI's South Dock.

62.     On July 25, 2008, Masefield made a further claim against TVI in the amount of $3,484,511.43.  This claim included the unpaid amount of the first claim ($1,463,945.52) as well as an additional $2,020,565.90 for vessel non-utilization, reverse-lightering, cleaning costs, and tank bottoms converted by TVI.

63.     On July 31, 2008, after being unable to formally resolve the claims pending since November 2008, Masefield filed this action, seeking damages in the amount of $3,489,922.40 the United States District Court for the District of New Jersey.

64.     During the discovery process, Masefield requested and obtained TVI's general ledger report from the time period of January 1, 2007 until June 30, 2009. General ledger reports from the time period June 30, 2009 until the present have not been produced.  Upon examination of the ledger, Masefield learned that TVI had been dissipating its assets since at least November 2007.

65.     Specifically, this document made clear that even after learning of Masefield's claim, TVI continued transferring its assets to Mr. Joseph DiMauro, EEF, and Clark Dodge, without valuable consideration and/or without adequate and fair consideration.

66.     The general ledger indicates that from November 2007 until June 30, 2009, TVI transferred at least $1,302,395.20 to DiMauro and/or his various shell entities including defendants Eastern Energy Fuels and Clark Dodge.

67. Through discovery, it has become evident that Joseph DiMauro is the alter ego and actual, beneficial and/or equitable owner of TVI. DiMauro exercises complete and total control over TVI's every move, including its business operations and financial dealings by virtue of his position as either an owner, lender to, and/or shareholder of TVI.

68. At the time that these various conveyances were consummated, Masefield was a creditor of TVI.

69. At the time of the conveyances, TVI, DiMauro, EEF and Clark Dodge knew of Masefield's claim, and that Masefield was a creditor of TVI.

70. Said conveyances constitute fraudulent conveyances as defined by N.J.S.A 25:2-25, because they were made with the actual intent to hinder, delay, and defraud Masefield in its eventual collection on a judgment.

71. Further evidencing the fraudulent nature of the transfers, pursuant to N.J.S.A 25:2-26:

a. The transfers were made to an insider. More specifically, the assets were transferred to Mr. Joseph DiMauro, and/or his various alter ego entities. DiMauro is an insider of TVI as that term is defined in N.J.S.A 25:2-22, as he and his alter ego entities "control" TVI.

b. The transfers were not disclosed to Masefield.

c. Before the transfers were made, TVI was on formal notice of Masefield's claims.

d. Following the filing of a lawsuit in this matter, TVI continued to dissipate its assets.

    e.     The transfers were of substantially all of TVI's liquid assets.

    f.     TVI is insolvent, in that it is unable to pay its debts as they come due.  TVI has been insolvent and grossly undercapitalized since its inception. Demonstrating this insolvency and undercapitalization, TVI was unable to pay for repairs to the South Dock following its collapse in October 2007.  Rather, TVI was required to obtain a loan in the amount of $305,820 from Masefield in order to repair the South Dock.

    g.     As a further direct result of its insolvency, TVI was unable to pay and/or timely pay the contractors performing repairs on the South Dock.  This caused repairs to lag on for over 16 months, until at least March 2009.

72.    As a direct and proximate result of TVI's fraudulent transfers, DiMauro, EEF, Clark Dodge and/or other entities owned or controlled by DiMauro, are in possession or control of at least $1.3 million dollars, all of which was received without adequate consideration, and in violation of the New Jersey's Uniform Fraudulent Transfer Act.

73.    Pursuant to N.J.S.A § 25:2-29, Masefield is entitled to an attachment of TVI's funds equaling the amount of damages sought herein, in the amount of $3,489,922 plus interest and costs.

74.    Pursuant to N.J.S.A § 25:2-29, Masefield is further entitled to a preliminary injunction preventing TVI from transferring $3,489,922.00, until the time that Masefield can successfully obtain an attachment.


WHEREFORE, plaintiff prays:

1. That process in due form of law according to the practice of this Court may issue against Defendants.

2. That if Defendants cannot be found within this District, that all of their property within this District be attached in the sum set forth above, with interest and costs.

3. That a decree may be entered in favor of Plaintiff against Defendants for the amount of Plaintiff's damages as contained in each and every count, together with interest and costs.

4. That an order of attachment issue, allowing Masefield to attach TVI's funds equaling the amount of damages sought herein, in the amount of $3,489,922 plus interest and costs.

5. That an injunction issue, enjoining TVI, Mr. Joseph DiMauro, Eastern Energy Fuels and Clark Dodge from making any transfers intended to defraud Masefield, or frustrate collection of judgment.

6. Plaintiff prays for such other, further and different relief as to this Court may seem just and proper in the premises.

Dated: South Amboy, New Jersey
April 6, 2011

HILL RIVKINS LLP
Attorneys for Plaintiff

By: <u>*/S/ Robert G. Clyne*</u>
Robert G. Clyne
102 South Broadway
South Amboy, NJ 08879
(732) 838-0800

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

**Index No. 08-3850 (JLL) (CCC)**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

---------------------------------------------------------x

# EXHIBIT E

Frank J. Franzino, Jr.
Meier Franzino & Scher, LLP
Attorneys for Defendants
Joseph DiMauro, Eastern Energy
Fuels, Inc. and Clark Dodge and
Company, Inc.
570 Lexington Avenue, 26th Floor
New York, New York 10022
(212) 759-9770
and
Winne Banta Hetherington Basralian & Kahn, P.C.
Court Plaza South – East Wing
21 Main Street, Suite 101
P.O. Box 647
Hackensack, New Jersey 07601-0647
(203) 487-3800

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

-----------------------------------------------------------x

**Index No. 08-3850 (JLL) (CCC)**

*Document Electronically Filed*

**ANSWER TO SECOND AMENDED COMPLAINT**

Defendants Eastern Energy Fuels, Inc. ("Eastern"), and Clark Dodge and Company, Inc. ("Clark Dodge") (hereinafter collectively referred to as Eastern Defendants) by their attorneys, Meier Franzino & Scher, LLP and Winne Banta Hetherington Basralian & Kahn, P.C., as and for its Answer to the Second Amended Complaint herein, allege as follows:

1. Eastern Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Second Amended Complaint.

2. Eastern Defendants admit the allegations contained in Paragraph 2 of the Second Amended Complaint.

3. Eastern Defendants admit the allegations contained in Paragraph 3 of the Second Amended Complaint.

4. Eastern Defendants admit the allegations contained in Paragraph 4 of the Second Amended Complaint.

5. Eastern Defendants admit the allegations contained in Paragraph 5 of the Second Amended Complaint.

6. The allegations contained in Paragraph 6 of the Second Amended Complaint are legal conclusions to which no responsive pleading is required.

7. The allegations contained in Paragraph 7 of the Second Amended Complaint are legal conclusions to which no responsive pleading is required.

8. Eastern Defendants deny the allegations contained in Paragraph 8 of the Second Amended Compliant and refer this Court to the Terminal Agreement No. 09/05 1001 for its terms.

9. Eastern Defendants deny the allegations contained in Paragraph 9 of the Second Amended Compliant and refer this Court to the Terminal Agreement No. 09/05 1001 for its terms.

10. Eastern Defendants deny the allegations contained in Paragraph 10 of the Second Amended Compliant and refer this Court to the Terminal Agreement No. 09/05 1001 for its terms.

11. Eastern Defendants deny the allegations contained in Paragraph 11 of the Second Amended Complaint.

12. Eastern Defendants deny the allegations contained in Paragraph 12 of the Second Amended Compliant and refer this Court to the Terminal Agreement No. 09/05 1001 for its terms.

13. In response to Paragraph 13 of the Second Amended Complaint, the Eastern Defendants admit that on or about October 17, 2007, the M/T Aral Wind struck TVI terminal's south dock located on the Hackensack River in Jersey City, New Jersey ("the TVI dock"), with great force causing it to be damaged and to collapse. Except as so admitted, the allegations contained in Paragraph 13 of the Second Amended Complaint are denied.

14. Eastern Defendants deny the allegations contained in Paragraph 14 of the Second Amended Complaint.

15. Eastern Defendants deny the allegations contained in Paragraph 15 of the Second Amended Complaint.

16. Eastern Defendants deny the allegations contained in Paragraph 16 of the Second Amended Complaint.

17. Eastern Defendants deny the allegations contained in Paragraph 17 of the Second Amended Complaint except to admit that Plaintiff paid $305,820.00 against monthly storage charges due to TVI.

18. Eastern Defendants deny the allegations contained in Paragraph 18 of the Second Amended Complaint.

19. Eastern Defendants deny the allegations contained in Paragraph 19 of the Second Amended Complaint except to admit that the TVI Dock was unavailable for use due to the destruction caused by the M/T Aral Wind.

20. Eastern Defendants deny the allegations contained in Paragraph 20 of the Second Amended Complaint.

21. Eastern Defendants deny the allegations contained in Paragraph 21 of the Second Amended Complaint.

22. Eastern Defendants deny knowledge of information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Second Amended Complaint.

23. Eastern Defendants deny the allegations contained in Paragraph 23 of the Second Amended Complaint.

24. Eastern Defendants deny the allegations contained in Paragraph 24 of the Second Amended Complaint.

25. Eastern Defendants deny the allegations contained in Paragraph 25 of the Second Amended Complaint.

26. Eastern Defendants deny the allegations contained in Paragraph 26 of the Second Amended Complaint.

27. Eastern Defendants deny the allegations contained in Paragraph 27 of the Second Amended Complaint except to admit that Plaintiff paid $305,820.00 against monthly storage charges due to TVI.

28. Eastern Defendants deny the allegations contained in Paragraph 28 except to admit the Mr. DiMauro lent money to TVI.

29. Eastern Defendants deny the allegations contained in Paragraph 29 of the Second Amended Complaint.

30. Eastern Defendants deny the allegations contained in Paragraph 30 of the Second Amended Complaint.

31. Eastern Defendants deny the allegations contained in Paragraph 31 of the Second Amended Complaint.

32. Eastern Defendants deny the allegations contained in Paragraph 32 of the Second Amended Complaint.

33. In response to Paragraph 33 of the Second Amended Complaint, Eastern Defendants repeat and reallege all of their responses in Paragraphs 1 through 32 of this Answer as though fully set forth herein.

34. In Response to Paragraph 34 of the Second Amended Complaint, Eastern Defendants admit that TVI entered into Agreement # 09/05-1002 and refer this Court to the terms therein.

35. Eastern Defendants deny the allegations contained in Paragraph 35 of the Second Amended Complaint.

36. Eastern Defendants deny the allegations contained in Paragraph 36 of the Second Amended Complaint.

37. Eastern Defendants deny the allegations contained in Paragraph 37 of the Second Amended Complaint.

38. Eastern Defendants deny the allegations contained in Paragraph 38 of the Second Amended Complaint.

39. Eastern Defendants deny the allegations contained in Paragraph 39 of the Second Amended Complaint.

40. In response to Paragraph 40 of the Second Amended Complaint, Eastern Defendants repeat and reallege all of their responses in Paragraphs 1 through 39 of this Answer as though fully set forth herein.

41. Eastern Defendants deny the allegations contained in Paragraph 41 of the Second Amended Compliant and refer this Court to the Agreement No. 09/05 1001 for its terms.

42. Eastern Defendants deny the allegations contained in Paragraph 42 of the Second Amended Compliant and refer this Court to the Agreement No. 09/05 1001 for its terms.

43. Eastern Defendants deny the allegations contained in Paragraph 43 of the Second Amended Complaint.

44. Eastern Defendants deny knowledge of information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 of the Second Amended Complaint.

45. Eastern Defendants deny the allegations contained n Paragraph 45 of the Second Amended Complaint.

46. In response to Paragraph 46 of the Second Amended Complaint, Eastern Defendants repeat and reallege all of their responses in Paragraphs 1 through 45 of this Answer as though fully set forth herein.

47. Eastern Defendants deny the allegations contained in Paragraph 47 of the Second Amended Compliant and refer this Court to the Agreement No. 09/05 1001 for its terms.

48. Eastern Defendants deny the allegations contained in Paragraph 48 of the Second Amended Complaint.

49. Eastern Defendants deny the allegations contained in Paragraph 49 of the Second Amended Complaint.

50. Eastern Defendants deny the allegations contained in Paragraph 50 of the Second Amended Complaint.

51. Eastern Defendants deny the allegations contained in Paragraph 51 of the Second Amended Complaint.

52. In response to Paragraph 52 of the Second Amended Complaint, Eastern Defendants repeat and reallege all of their responses in Paragraphs 1 through 51 of this Answer as though fully set forth herein.

53. Eastern Defendants deny the allegations contained in Paragraph 53 of the Second Amended Compliant and refer this Court to the Agreement No. 09/05 1001 for its terms.

54. Eastern Defendants deny the allegations contained in Paragraph 54 of the Second Amended Compliant and refer this Court to the Agreement No. 09/05 1001 for its terms.

55. Eastern Defendants deny the allegations contained in Paragraph 55 of the Second Amended Complaint.

56. In response to Paragraph 56 of the Second Amended Complaint, Eastern Defendants repeat and reallege all of their responses in Paragraphs 1 through 55 of this Answer as though fully set forth herein.

57. Eastern Defendants deny the allegations contained in Paragraph 57 of the Second Amended Complaint.

58. Eastern Defendants deny the allegations contained in Paragraph 58 of the Second Amended Complaint.

59. Eastern Defendants deny the allegations contained in Paragraph 59 of the Second Amended Complaint.

60. Eastern Defendants deny the allegations contained in Paragraph 60 of the Second Amended Complaint.

61. Eastern Defendants deny the allegations contained in Paragraph 61 of the Second Amended Complaint.

62. Eastern Defendants deny the allegations contained in Paragraph 62 of the Second Amended Complaint.

63. In response to Paragraph 63, Eastern Defendants admit that plaintiff filed this action but denies the remaining allegations of the Paragraph 63 of the Second Amended Complaint.

64. Eastern Defendants deny the allegations contained in Paragraph 64 of the Second Amended Complaint.

65. Eastern Defendants deny the allegations contained in Paragraph 65 of the Second Amended Complaint.

66. Eastern Defendants deny the allegations contained in Paragraph 66 of the Second Amended Complaint.

67. Eastern Defendants deny the allegations contained in Paragraph 67 of the Second Amended Complaint.

68. Eastern Defendants deny the allegations contained in Paragraph 68 of the Second Amended Complaint.

69. Eastern Defendants deny the allegations contained in Paragraph 69 of the Second Amended Complaint.

70. Eastern Defendants deny the allegations contained in Paragraph 70 of the Second Amended Complaint.

71. Eastern Defendants deny the allegations contained in Paragraph 71 of the Second Amended Complaint.

72. Eastern Defendants deny the allegations contained in Paragraph 72 of the Second Amended Complaint.

73. Eastern Defendants deny the allegations contained in Paragraph 73 of the Second Amended Complaint.

74. Eastern Defendants deny the allegations contained in Paragraph 74 of the Second Amended Complaint.

**FIRST AFFIRMATIVE DEFENSE**

75. Plaintiff has failed to state a cause of action against the Eastern Defendants as to the Fifth Claim in the Second Amended Complaint.

**SECOND AFFIRMATIVE DEFENSE**

76. Plaintiff's alleged damages were solely caused by plaintiff's own culpable conduct and/or the conduct of third parties not under the direction or control of the Eastern Defendants.

**THIRD AFFIRMATIVE DEFENSE**

77. Eastern Defendants did not violate any legal duty owed to plaintiff.

**FOURTH AFFIRMATIVE DEFENSE**

78. Plaintiff's claims are barred by the doctrines of waiver and estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

79. Plaintiff's claims are barred by plaintiff's own failure to mitigate its damages.

**SIXTH AFFIRMATIVE DEFENSE**

80. Plaintiff's claims are barred by its own breach of the contract with defendant TVI.

**WHEREFORE,** Eastern Defendants request judgment against plaintiff as follows:

(a) Dismissing the Fifth Count of the Second Amended Complaint as it fails to state a claim against the Eastern Defendants.

(b) Dismissing the Second Amended Complaint as any damages allegedly suffered by plaintiff were caused by plaintiff and/or by third parties not under the control or direction of Eastern Defendants.

(c) Dismissing the Second Amended Complaint as any damages suffered by plaintiff were caused by plaintiff's own culpable conduct.

(d) Dismissing the Second Amended Complaint as the Eastern Defendants did not violate any duty owed to plaintiff.

(e) Dismissing the Second Amended Complaint as plaintiff failed to mitigate its damages.

(f) Dismissing the Second Amended Complaint as any alleged damages suffered by plaintiff were caused by its own breach of contract.

(g) Dismissing the Second Amended Complaint as the claims therein are barred by the doctrines of waiver and estoppel.

Case 2:08-cv-03850-JLL -MAH Document 93 Filed 04/26/11 Page 11 of 11 PageID: 1178

(h) Such other relief as may be proper and just under the circumstances.

**WHEREFORE,** Eastern Defendants demand judgment against plaintiff dismissing the Second Amended Complaint, costs of suit, attorney's fees, interest and such other relief as this Court may deem just, fair and equitable.

Dated: April 26 , 2011

**MEIER FRANZINO & SCHER, LLP**

By: ______________________
Frank J. Franzino, Jr.
570 Lexington Avenue, 26th Floor
New York, New York 10022
(212) 759-9700
ffranzino@mfslawllp.com

And

**Winne Banta Hetherington Basralian & Kahn, P.C.**
Court Plaza South – East Wing
21 Main Street, Suite 101
P.O. Box 647
Hackensack, New Jersey 07601
(203) 487-3800

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------x

**MASEFIELD INTERNATIONAL, INC.,**

**Plaintiff,**

**-against-**

**Index No. 08-3850 (JLL) (CCC)**

**TERMINAL VENTURES, INC., JOSEPH DIMAURO, EASTERN ENERGY FUELS, INC., and CLARK DODGE AND COMPANY, INC.**

**Defendants**

---

**TERMINAL VENTURES, INC.**

**Third-Party Plaintiff,**

**-against-**

**MASEFIELD AG, ARAL WIND LTD., M/T ARAL WIND, its engines, tackle, apparel, etc., LIBERTY MUTUAL INSURANCE COMPANY, and JOHN DOE**

**Third Party Defendants.**

---------------------------------------------------------x

# EXHIBIT F


PLAINTIFF'S
EXHIBIT

TERMINAL VENTURES, INC
D/B/A  Eastern Terminal Ventures, Inc.
AGREEMENT OF GENERAL CONDITIONS
Contract

This agreement, and the attached Schedule which is made part hereof (the "Agreement"), dated March 27, 2007 is made between TERMINAL VENTURES, INC, (hereinafter called "TVI") and MASEFIELD INTERNATIONAL INC. (hereinafter called Masefield) The capitalized acronyms and terms used herein and not otherwise defined herein shall have the same meaning as ascribed to them in the industry. For and in consideration of the mutual covenants and agreements undertaken herein, TVI and Masefield agree as follows, to-wit:

1.  TVI hereby agrees during the term of this Agreement to store for Masefield in its public warehouse tank storage facilities in Jersey City, New Jersey (the "Jersey City terminal") oil as more specifically set forth in the attached Schedule.  TVI shall retain exclusive control and administration of all tank(s) including all throughput in or out thereof, and all premises, lines and appurtenances appertaining thereto. Unless otherwise specified, TVI shall provide storage tanks and lines constructed of plain, unlined steel having standard construction, pumps, valves and accessories commonly used for the tanks during the term of this agreement in order to facilitate tank inspection or repair.  In the event a tank becomes unavailable because of any mechanical failure TVI shall promptly notify Masefield and provide replacement storage at the Jersey City terminal, as quickly as possible.  Masefield's obligation to pay the fee applicable for such tank shall abate during the period that the tank is not available. If TVI is unable to repair the tank or provide replacement storage to Masefield within ninety consecutive (90) days, then Masefield may terminate this agreement, in part for the unavailable tank, without further liability..

TVI further warrants that for the duration of this Agreement the Terminal and associated facilities shall be maintained and operated in accordance with all relevant safety, operational and environmental laws, rules and regulations.

TVI warrant that for the duration of this agreement the Terminal shall be officially designated as a NYMEX delivery point. Should this designation be removed TVI shall use reasonable efforts to reinstate it.

2.  Masefield shall deliver to TVI for storage clean petroleum products or biodiesel or blends thereof, within the following parameters
    a)  flash point greater than 110 deg F.
    b)  Pour point less than 100 deg. F
    c)  Viscosity at 122 deg. F less than 500 SSF.

Masefield or its representative is granted the right at its expense to inspect the tank(s) assigned to Masefield products from time to time prior to commencement of unloading of Masefield materials into said tank(s).

3.  Masefield is to provide TVI with a MSDS for every receipt into TVI's terminal. Masefield warrants that material delivered for storage under this Agreement will conform to Masefield specifications for such materials.

4.  TVI agrees to receive, deliver and / or transfer into and out of its terminal such materials as may be stored therein under the terms hereof, to provide such other services as may be specified in said "SCHEDULE" under "RATE", and to provide the facilities needed therefor.

Masefield shall have the right to:

    a.  Observe and verify TVI's performance of its services hereunder.
    b.  Have ingress to and egress from and within the Terminal upon prior notice and during reasonable times to the extent required for purposes of this Agreement.
    c.  Review and audit upon prior written notice and at reasonable times TVI's records related to the performance of this Agreement, which records TVI agrees to maintain in a manner generally accepted in the industry and to make copies thereof at Masefield expense.

    d.  Have an independent inspector inventory Masefield tanks, monthly or more often if necessary at Masefield expense.

Masefield agrees to pay TVI monthly the agreed monthly storage charge as well as all other charges incurred in moving fuel in and out of TVI's tank/s as specified in the attached Schedule. Masefield also agrees to pay TVI any other charges accruing hereunder, which shall be mutually agreed upon, from time to time, within three (3) days of receipt of the invoice. TVI shall have the right at any time to require Masefield to post a Corporate Guarantee in order to secure payment of storage and other charges to be paid by Masefield hereunder. Masefield reserves the right to audit all oil charges invoiced by TVI for up to one (1) year beyond the term of this Agreement.

5.    The term "barrel" whenever used in this Agreement or attached Schedule shall mean 42 U.S. gallons at 60 degree F; the term "materials" whenever used in this Agreement or attached Schedule shall mean materials which are stored for Masefield but which may be owned by Masefield or by others. An independent petroleum inspector selected and paid for by Masefield shall determine the quantity of oil received into terminal and shipped out. All measured quantities shall be adjusted to 60°F in accordance with the last supplement or amendment to ASTM-IP Petroleum Measurement Table 6B (ASTM-1250) Except for TVI's Material bottoms in tanks and compatible line fills/line displacements, Masefield product will not be commingled with other product in the terminal. TVI will be liable to MASEFIELD for contamination, which result from TVI's failure to use reasonable care in the handling of Masefield product.

6.    This Agreement shall remain in effect for the period of time specified in the attached Schedule. If additional tank(s) are required by Masefield from time to time hereafter, such requirement may be evidenced by a Letter Agreement, or otherwise, containing terms and conditions mutually acceptable to Masefield and TVI and which shall become an addition to the attached Schedule, and the terms of this Agreement shall also apply to it.

During the term of this agreement Masefield may 'sub-lease' any or all of its available shell capacity to a third party, provided however, Masefield shall have secured the prior written approval of TVI to the sub-leasee and to the terms and conditions of the sub-lease agreement. Such third party must be acceptable to TVI, however such acceptance shall not be unreasonably withheld. Masefield warrants that any third party shall act in accordance with TVIs rules and regulations. Any and all costs, losses, damages or expenses incurred by TVI relating to or arising out of the failure of any third party to act in accordance with TVI's rules and regulations shall be for Masefield's account.

7.    Masefield agrees, promptly upon the expiration or termination of this Agreement to remove all materials contained in TVI's terminal and insure that no materials are left in the tanks, and that the tanks are returned to the original condition at the inception of this Agreement. Upon termination of this Agreement TVI and Masefield will settle up tank bottom and line displacement imbalances based upon Platt's New York Harbor Mean Cargo Price Heating Oil on a mutually agreeable date.

8.    TVI shall be liable for loss or damage to Masefield materials when loss or damage is caused by TVI's negligence in the safekeeping and handling of Masefield materials.

TVI's custody of Masefield oil shall be deemed to commence either at the flange connection on the vessel to the dock hose, if TVI provides the hose, or at the first flange of TVI's permanent shore connection to dock hose on Masefield barge if TVI provides the hose or at the first flange of TVI's permanent shore connection if the barge provides the hose. Masefield and TVI will maintain a running inventory and reconcile on a monthly basis any deficiencies exceeding 0.5%, such losses over 0.5% shall be reimbursed by TVI.

TVI shall be responsible for any loss or damage to Masefield materials at any time while Masefield materials are in the care, custody and control of TVI.

TVI shall indemnify, defend and hold harmless Masefield from and against any and all third party claims for bodily injury, property damage, etc. arising from and out of any negligent event, circumstance, act or incident

first occurring or existing during the period when TVI has care, custody and control of Masefield materials or TVI is providing its services to Masefield as set forth in this Agreement.

9.   All movements and receipts or deliveries of Masefield materials hereunder, whether by barge, vessel, or rack shall be on a first come/first served basis Masefield shall give TVI at least three (3) days advance notice of the arrival of each tanker and at least twenty four (24) hours advance notice of the arrival of each barge making deliveries or loading of products into the storage facilities, specifying the quantity and nature of products into the storage hereunder. Such tankers and barges will be accommodated with every vessel using the storage facilities in the order of arrival. Vessels loading or discharging for Masefield account will be subject to TVI's applicable dock rules as they may be in effect from time to time and such vessels will proceed to and from TVI's dock facilities with promptness and dispatch. Vessels will load or unload, as the case may be, on a continuous basis.

All vessel nominations are subject to Coast Guard approval. The terminal is not responsible for any demurrage due to government action. Further all nominations are due three (3) days prior to delivery date. If the nominations fall within or after the three (3) day period, they are accepted on a first come basis and the terminal is not responsible for any demurrage.

If a vessel/barge nomination is accepted and the terminal crews are deployed, and the barge does not arrive at the terminal dock(s) at the nominated time all incremental costs incurred (for example, use of an additional crew) are billed at the hourly rate plus twenty (20) percent.

10.   TVI shall procure and maintain at its own expense the following insurance with at least the monetary limits specified and in forms and with insurance companies rated at a minimum of A10 by the Best Key Rating Guide:

a.
   1. Workers' Compensation Insurance in accordance with Worker's Compensation and Occupational Disease Laws.
   2. Employers' Liability Insurance for a minimum of $500,000 per accident.
   3. Where applicable, insurance required by the United States Longshoremen's and Harbor Workers' Act, the Federal Employers' Liability Act, and the Jones Act.

b.   Comprehensive General Liability Insurance (occurrence form only) including coverage for premises operations, contractual liability, products/completed operations, independent contractors, xcu (explosion, collapse, underground hazard) coverage and broad form property damage coverage with minimum limits of $10,000,000 per occurrence for bodily injury and property damage.

Comprehensive Automobile Liability Insurance covering all owned, leased and hired automobiles used by TVI with minimum limits of liability of $1,000,000 per occurrence for bodily injury or death and $500,000 per occurrence for property damage.

Pollution Legal Liability (PLL) Insurance including coverage for bodily injury, property damage, and both on-site and off-site clean-up with minimum limits of $10,000,000 per occurrence.

Note: All Liability coverages, with the exception of workers' compensation, shall name Masefield as an additional insured and provide that this coverage is primary without any right of contribution from insurance maintained by Masefield.

The All Risk Property Insurance, including replacement cost coverage for any property in TVI's care, custody and control, or any property TVI is legally responsible for, that results in loss or damage to Masefield materials as a result of TVI's negligence or otherwise, shall name Masefield as an additional insured and loss payee, as Masefield interests may appear or warrant.

TVI waives and will require its insurers to waive any rights of subrogation against Masefield.

Prior to the commencement of this Agreement, TVI shall provide Masefield with Certificates of Insurance evidencing that all insurance required under Clause #10 is in effect and providing a minimum of thirty (30) days written notice to Masefield of any cancellation or material alteration of any insurance to be provided under this Agreement.

Any insurance provided under this Clause #10 is in no manner to relieve or release TVI or limit its liability as to any and all obligations assumed under this Agreement.

11. Should Masefield fail to pay any monies due or to become due hereunder, or to comply with any of its other material obligations hereunder, within fifteen (15) days after its receipt of written notice from TVI of such default, then TVI shall have the right, at its option to:

(a) Terminate and cancel the within Agreement in which event there shall be due to TVI, as liquidated damages, a sum equal to the amount of the storage charges hereunder for one (1) month; or

(b) Place a warehouse lien for any and such amounts due to TVI and after a 90 day period liquidate such inventory to satisfy such liens.

If Masefield has commenced by reasonable means to cure any default not curable in fifteen (15) days, such additional time as is reasonably necessary to cure such default shall be granted Masefield before Masefield will be adjudged in default hereunder.

TVI's failure to strictly and promptly enforce these conditions shall not operate as a waiver of TVI's rights hereunder, TVI hereby reserves the right to enforce prompt payment of storage charges or other charges, or to cancel the within Agreement regardless of any indulgences, or extensions previously granted to Masefield.

12. TVI reserves the right to reject any vessel or barge or any material contained therein, which it reasonably determines to be unsuitable for handling without liability whatsoever on the part of TVI to Masefield for any loss, damage, demurrage or expense, consequential or remote, sustained by Masefield as a result of such rejection.

13. It is stipulated that the charges specified herein or in the attached Schedule are based upon TVI's current cost of operation and construction necessary to comply with governmental laws, rules and regulations as presently enforced, particularly with respect to environmental control and safety standards. If, during the term of this Agreement, there should occur a change in governmental policy affecting enforcement of said laws, rule and regulations; or TVI should reasonably incur significant additional costs ( greater than $75,000/year), applicable to this Agreement, in continuing to comply with existing regulations; or should there be enacted or promulgated new or revised laws, rules or regulations requiring additions to or modifications of TVI's facilities or changes in its methods of operation increasing the cost of services and providing facilities hereunder, and TVI reasonably determines that it can modify its facilities or change its methods of operations, TVI shall advise Masefield of any increase in costs resulting therefrom, in which event the charges hereunder shall be adjusted to compensate TVI for such increased costs, provided however, Masefield is granted thirty (30) days from the date of advice of cost increases to elect whether to accept such charges or to terminate the within Agreement. If Masefield elect to terminate the agreement TVI may either accept such termination or reject and continue said Agreement on the pricing as agreed upon in the attached Schedule. Upon termination each party hereto shall thereupon be discharged of any further liability hereunder; provided however, such termination shall not relieve Masefield of the obligation to pay storage fees and charges incurred hereunder prior to the date of such termination.

14. All inspectors and other individuals designated by Masefield to do work for Masefield on the property of TVI, shall meet TVI's insurance and indemnification requirements.

15. FORCE MAJEURE. No failure or omission to carry out or to observe any of the terms, provisions or conditions of this Agreement shall give rise to any claim by one party hereto against the other, or be deemed a breach of this Agreement if the same shall arise out of war, hostilities, acts of the public enemy, or of

MJ\

belligerents, terrorism, sabotage, blockade, expropriation, condemnation, requisition, confiscation, compliance, voluntary and otherwise, with federal, state or local laws, regulations, orders or decrees including but not limited to those pertaining to environmental, maritime and transport by water and by land; Acts of God, fire, frost or ice, storm, lightning, tide, accidents of navigation or breakdown or injury to vessels; accidents to or closing of harbors, docks, canals, channels or other assistances to or adjuncts of shipping or navigation; strikes or combination of workmen, lockouts or other labor disturbances; explosion, accidents by fire or otherwise to pipes, storage tanks, installations or machinery, or any other cause which shall not be reasonably within the control of the party affected thereby.

16. The laws of the State of New York applicable to contracts to be performed entirely within that State shall govern and apply to the terms of this Agreement and its performance thereof.

17. This Agreement shall be binding upon, and inure to the benefit of the parties hereto and shall not be assignable by either party without the written of the non-assigning party.

18. ENTIRE AGREEMENT
This Agreement contains the entire agreement between the parties with respect to the subject matter hereof. This Agreement may not be modified, changed or supplemented, nor any obligations hereunder are deemed waived, except by written instrument agreed to by both parties. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto

19. NO WAIVER
No waiver of any breach of the Agreement or any provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or any other provision herein contained, nor act as an extension of time for performance of any other obligations or acts.

20. All notices required or permitted by this Agreement shall be given by certified mail, and FAX, addressed as follows:

To: Masefield International Inc
Suite 1330
3050 Post Oak Boulevard
Houston
Texas 77056

Attn: Manager of Energy Contracts
Fax No.: 713 871 1119
See attached Schedule.

To: Terminal Ventures, Inc.
195 Howell Street
Jersey City, NJ 07306
Fax: (201) 798-3350

Dated and signed by Terminal Ventures, Inc.

[ 5 ] Day of [ APRIL ], 2007

BY: Andrew Hritz

TITLE: Vice President

Date and signed by Masefield International, Inc

[ ] Day of [ ], 2007

AH

BY: Aidan Shilling

TITLE: President

SCHEDULE

Contract #09/05-1001: Masefield

Terminal Location: TVI

Customer: Masefield International, Inc

Date of Agreement: March 27, 2007

Location of Customer's Principal Office: 3050 Post Oak Boulevard, Houston, Texas 77056

Attn: Manager of Energy Contracts

Fax No.: 713 871 1119

TERM OF AGREEMENT: Two (2) years, beginning June/2007 and ending June/2009 with the buyer having the option to renew for two years by giving a written notice to TVI not less than ninety (90) days prior to the end of the second year. Storage fee for the second period shall be $1.03 / per bbl shell capacity storage per month.

Tank Cleaning (All tanks) (Masefield Converting Black Oil Storage Tank to Clean Product Storage)

All costs of cleaning the tanks shall be for the account of Masefield, the cost is currently estimated to be approximately $300,000. TVI shall obtain quotes for all planned works and such quotes and scope of work shall be passed to Masefield for approval. Only those works and quotes accepted in writing by Masefield shall be payable. Masefield shall pay any agreed amounts within 5 days of invoice receipt.

Upon completion of cleaning and prior to putting the tanks into service TVI shall arrange, at its own expense, a recognized company (acceptable to Masefield) to 'strap' the tanks to produce a new set of calibration tables. If, as a result of the strapping operation, the shell capacity is reduced, storage fees shall be determined based on the new volume.

Clean Oil Storage

Rate: $0.90 / per bbl shell capacity storage per month, 1 round turn throughput included. If at any time during this agreement the working volume of a tank falls below 95% of the shell capacity then Masefield shall pay basis 105% working volume.

Rack charge: $0.01 per gallon delivered to Masefield trucks during normal working hours. Otherwise, weekends at the worker's hourly at time and a half plus twenty (20) percent. Holidays to be charged at worker hourly rate at double time plus twenty (20) percent..

Holiday Pay: Barges, tank transfers or any other special task requested by MASEFIELD received/performed on recognized terminal holidays will be billed by TVI to Masefield at double the TVI worker's hourly rate plus twenty (20) per cent. TVI's holidays are as follows: New Year's Day, President's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Columbus Day, Thanksgiving Day, and Christmas Day.

Tank Transfers, Consolidations and Stripping: will be invoiced at a rate of $150.00 per hour.

Tank Sparging and Circulation: will be invoiced at a rate of $0.05 per barrel

EXCESS THROUGHPUT: 0.60/bbl for second round turn throughput (i.e. one in and one out) 0.30/bbl for third and each additional round turn throughput in one month storage period.

Invoices: Due and payable five (5) days after receipt. If the fifth day in which the invoice is to be paid falls on a Saturday, Sunday or Banking Holiday, then the invoice shall be paid on the next working day. All past due balances will incur interest charges of one percent (1%) per month until paid.

First Month Fees: TVI agree that a discount of 30% shall be applied to the first month of storage fees invoiced under this Agreement.

MS

SCHEDULE contd.
Contract #09/05-1001: Masefield

TERMINAL INFORMATION

| TK # | SHELL CAPACITY BBLS | EMPTY WORKING CAPACITY BBLS | DESCRIPTION |
|---|---|---|---|
| 25 | 93,000 | 88,350 | Tanks capable of achieving / maintaining 150°F |
| 34 | 91,000 | 86,450 | New floor / sparging connection / high and low suction |
| 27 | 10,800 | 10,260 | Connected to North and South Pier |
| 28 | 10,800 | 10,260 | Access to 4 truck rack positions |
| 29 | 10,800 | 10,260 | |
| 30 | 10,800 | 10,260 | |
| 32 | 10,800 | 10,260 | |
| | | | |
| | | | |

INBOUND / OUTBOUND CAPABILITY: Marine

| MARINE CAPABILITY | | | | | |
|---|---|---|---|---|---|
| BERTH | Max LOA | Max Beam | MLW DRAFT | MAX BCM | VESSELS HANDLED / NOTES |
| North Dock | 450 | 120 | 22' | 225 | Minimum vessel loading rate 1,500 US Bbls per hour |
| South Dock | 700 | 120 | 29' | 350 | Minimum vessel loading rate 2,500 US Bbls per hour |

TVI- intends to dredge on a regular basis, as needed, government permitting. However, some loss of depth will occur between dredgings.

HOURS OF OPERATION: 24 hours /day, 7 days / week year round

FACILITY/REPAIR/MAINTENANCE: TVI will maintain all facilities in good working order and perform maintenance so as to minimize impact on Masefield operation. TVI public warehouse facilities in Jersey City shall provide one safe port and one safe and always accessible berth, free of wharfage and dockage fees during the term of this Agreement.

PRODUCT TEMPERATURE: TVI will heat tanks in accordance with specific instructions received from Masefield. All tanks are capable of heating to / maintaining +150°F

HEATING CHARGES: Fuel provided by the terminal and used for steam generation for heating Masefield material shall be charged on the following basis.
Volume : the quantity measured as being used solely for the generation of steam for the Masefield material during a calendar month.
Price : 50% No 6 Oil 0.3% sulfur Mid Platts cargo NYH plus 50% No 2 Oil sulfur Mid Platts cargo NYH.
Quotation Period : the month average for the period when the fuel was consumed.

HYDROGEN SULFIDE TESTING: Vessel compartment headspace $H_2S$ levels (PPM) should be faxed to TVI. TVI will accept written dockside results from Masefield inspectors. TVI will not discharge any vessel with average headspace $H_2S$ level >50 PPM or with any single compartment level >100 PPM unless cargo is treated with $H_2S$ scavenger upon discharge.\

QWS

Case 2:08-cv-03850-JLL -CCC Document 51-1 Filed 10/29/10 Page 10 of 138 PageID: 379

IN WITNESS WHEREOF, TVI and Masefield, by their respective duly authorized representatives, have executed this Agreement of General Conditions effective as of the Date of Agreement.

TERMINAL VENTURES, INC.

By: ______________________

Title: VICE PRESIDENT

Date: 04/05/2007

Masefield International, Inc

By: ______________________

Title: President

Date: ______________________